Bold

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 24-274 |
| DONALD SMITH | (18 U.S.C. § 1343) |
| | [UNDER SEAL] |

FILED
DEC 10 2024
CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

### INDICTMENT

The grand jury charges:

### COUNTS ONE THROUGH EIGHT

At times material to this Indictment:

1. The defendant, DONALD SMITH ("SMITH"), was a resident of Pittsburgh, Pennsylvania.

2. Smith & Jamison Corporation (S&J) was incorporated by SMITH in 2013 as a for-profit nonstock business. It operated from 2013 to the date of Indictment out of Burgettstown and Pittsburgh, Pennsylvania.

3. From approximately April 2019 through October 2024, SMITH defrauded the United States government of hundreds of thousands of dollars through his operation of S&J.

### Background Regarding Government Contracting

4. The Defense Logistics Agency ("DLA") managed the global defense supply chain, providing materials to, among other entities, the United States Army, Navy, Air Force, and Marine Corps.

5. DLA publicly posted Requests for Quotation (RFQs), describing or linking to the precise requirements for products it sought to purchase. These requirements commonly included

the height, length, and width of the product requested, as well as the material from which the product must be made.

6. Businesses bid in response to RFQs, providing the price at which they would provide the requested product, and the quantity that could be provided. Frequently, businesses were required to list, as part of their bids, the manufacturer or source from which they would obtain the product.

7. Critical Application Items ("CAIs") were products whose failure could affect the mission, performance, readiness, or safety of military equipment.

8. Products provided pursuant to contracts with DLA were required to meet the exact specifications provided by DLA, since they otherwise would not work for the purpose for which they were procured. DLA relied upon contractors to provide the promised products, and at times had the products shipped directly to military personnel in the field without reviewing the products.

9. When DLA received a product that did not meet the required specifications, it, at times, sent the contractor who provided the nonconforming product a Product Quality Deficiency Report (PQDR), explaining the deficiency. The PQDRs would, at times, be prepared by military personnel in the field who received the product and realized it was not fit for purpose. In part, PQDRs were issued to enable contractors to correct whatever process led to their provision of the incorrect product and to prevent recurrences.

10. The government could debar a contractor, which, among other consequences, excluded the contractor from receiving government contracts except in limited circumstances. Such a decision could be effectuated, among other reasons, where the contractor's violation of the terms of a government contract were so serious as to justify debarment, including through a willful failure to perform in accordance with the terms of one or more contracts, or a history of failure to perform, or of unsatisfactory performance of, one or more contracts.

11. SMITH was debarred from on or about November 23, 2010, through on or about November 22, 2013. On or about August 12, 2015, SMITH was informed that he was again debarred, this time from on or about June 30, 2015, through on or about June 29, 2018. On or about August 12, 2015, SMITH was also informed that S&J was debarred from June 30, 2015, through June 29, 2018.

## The Scheme and Artifice to Defraud

12. From no later than in and around April 2019, through on or about October 8, 2024, in the Western District of Pennsylvania and elsewhere, SMITH devised and intended to devise a scheme and artifice to defraud and for obtaining money by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises were false and fraudulent when made.

13. It was part of the scheme and artifice to defraud that SMITH, both directly and through third parties, agreed to provide products to DLA that were from approved sources and matched required specifications. He then, directly and through third parties, falsely billed as if such products were provided whereas, as he well knew, the products provided were often not from approved sources and did not match required specifications.

14. It was a further part of the scheme and artifice to defraud that SMITH agreed to provide purported consulting services to individuals and entities who sold products to DLA (collectively "the third parties"), including Gold Peak Industries, LLC ("Gold Peak") and Wolfpack Supply, LLC ("Wolfpack").

15. It was a further part of the scheme and artifice to defraud that SMITH told the third parties that he had extensive experience with DLA contracting, and knowledge of the industry.

16. It was a further part of the scheme and artifice to defraud that, in his role as "consultant", SMITH directed the third parties on which RFQs to bid on, and what they should report on the bids as the source from which they would obtain the products.

17. It was a further part of the scheme and artifice to defraud that, once the third parties were awarded a contract with DLA, SMITH directed the third parties as to the exact product to provide to DLA, including the source from which they should obtain the product. This source was often different than the source he had instructed the third parties to list as the source of the product on their bid. As SMITH well knew, the products he directed the third parties to purchase, including with respect to CAIs, frequently did not match the required specifications under the contracts.

18. It was a further part of the scheme and artifice to defraud that the third parties then invoiced DLA as if they had provided the correct product under the contracts and received payment on those invoices.

19. It was a further part of the scheme and artifice to defraud that the third parties made a considerable profit, boosted in large part by the low costs incurred from purchasing products that did not meet the required specifications.

20. It was a further part of the scheme and artifice to defraud that SMITH received approximately 50% of the profits obtained by Gold Peak and Wolfpack. In all, SMITH received over $500,000 from Gold Peak and Wolfpack combined for his purported consulting services.

21. It was a further part of the scheme and artifice to defraud that, because it was the third parties' names on the government contracts, it was the third parties, and not SMITH, that received PQDRs and faced potential debarment for repeatedly failing to provide required products in accordance with issued contracts.

22. It was a further part of the scheme and artifice to defraud that, when third parties received PQDRs, SMITH attempted to provide explanations for the product deficiencies other than

the true cause, that is, SMITH's instruction to the third parties to purchase products that did not match the requirements specified in the contracts.

23. It was a further part of the scheme and artifice to defraud that, after he stopped receiving payment for his purported consulting services, SMITH caused S&J to bid directly in response to RFQs.

24. It was a further part of the scheme and artifice to defraud that SMITH frequently provided products to DLA that he knew did not match the required specifications under the contracts awarded to S&J.

25. It was a further part of the scheme and artifice to defraud that SMITH nevertheless invoiced DLA as if S&J had provided the required products and received payment on those invoices.

26. It was a further part of the scheme and artifice to defraud that S&J received hundreds of thousands of dollars from the Treasury as payment for products S&J claimed it provided to DLA.

## The Wire Communications

27. On or about the dates listed below, in the Western District of Pennsylvania and elsewhere, the defendant, DONALD SMITH, for the purpose of executing and attempting to execute the scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, and in attempting to do so, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs and signals, that is bids submitted from the below-listed entities, relating to the below-listed contracts, each such transmission being a separate count of this Indictment:

| Count Number | Date | Submitting Entity | Contract Number |
|---|---|---|---|
| One | December 11, 2019 | Gold Peak | SPE8E7-20-V-0446 |
| Two | April 14, 2020 | Gold Peak | SPE8E7-20-P-1206 |
| Three | July 17, 2020 | Gold Peak | SPE8E7-20-P-1706 |
| Four | May 13, 2023 | S&J | SPE4A6-24-P-B004 |
| Five | May 16, 2023 | S&J | SPE8E8-23-V-1178 |
| Six | July 12, 2023 | S&J | SPE4A6-24-P-5576 |
| Seven | December 12, 2023 | S&J | SPE4A6-24-P-9871 |
| Eight | January 24, 2024 | S&J | SPE4A6-24-P-E058 |

All in violation of Title 18, United States Code, Section 1343.

## **FORFEITURE ALLEGATIONS**

1. The grand jury realleges and incorporates by reference the allegations contained in Counts One through Eight of this Indictment for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. The United States hereby gives notice that, upon the defendant, DONALD SMITH'S, conviction of any of the offenses outlined in Counts One through Eight of this Indictment, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including, but not limited to:

<u>Money Judgment</u>

A sum of money equal to at least approximately $414,233.10 in United States currency, representing the approximate amount of proceeds obtained as a result of the offenses.

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described above.

A True Bill,

*[signature]*
FOREPERSON

*[signature]*

ERIC G. OLSHAN
United States Attorney
IL ID No. 6290382

*[signature]*

WILLIAM B. GUAPPONE
Assistant United States Attorney
NC ID No. 46075